UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| ANA H., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:19-cv-432-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM DECISION |
| | § | AND ORDER |
| Defendant. | § | |

## <u>INTRODUCTION</u>

Plaintiff Ana H. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") that denied her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the Act). *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 18).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 12, 16. Plaintiff also filed a reply. *See* ECF No. 17. For the reasons set forth below, Plaintiff's motion (ECF No. 12) is **DENIED,** and the Commissioner's motion (ECF No. 16) is **GRANTED.**

## <u>BACKGROUND</u>

Plaintiff protectively filed her DIB application on September 24, 2012, alleging disability beginning October 16, 2011 (the disability onset date). Transcript ("Tr.") 297. Plaintiff alleged disability due to brain surgery; no vision in right eye; frequent falls; severe headaches; and brain aneurysm. Tr. 485.

Plaintiff's application was denied initially on January 17, 2013, after which she requested an administrative hearing. Tr. 315, 340. On March 25, 2014, a hearing was held in Buffalo, New York, before Administrative Law Judge ("ALJ") Grenville W. Harrop, Jr. ("ALJ Harrop"). Tr. 315, 326. Plaintiff appeared and testified at the hearing and was represented by Kelly Laga, an attorney. Tr. 315. Jay Steinbrenner, an impartial vocational expert ("VE"), also appeared and testified at the hearing. *Id*. On June 19, 2014, ALJ Harrop issued a decision finding Plaintiff not disabled. Tr. 151-70, 312-26. On February 3, 2016, the Appeals Council granted Plaintiff's request for review, vacated the ALJ's decision, and remanded the case for further proceedings. Tr. 331-35.

On April 10, 2018, a second hearing was held in Buffalo, New York, before ALJ Paul Georger (the "ALJ"). Plaintiff appeared and testified at the hearing and was represented by Nicholas Di Virgilio, an attorney. Tr. 154. Lanell R. Hall, an impartial vocational expert, also appeared and testified at the hearing. *Id*. On June 25, 2018, the ALJ issued another unfavorable decision. Tr. 189-216. On February 6, 2019, the Appeals Council denied Plaintiff's request for review. Tr. 1-4. The ALJ's June 25, 2018 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I. District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more

2

than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

## II.      The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

3

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his June 25, 2018 decision:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2016;

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of October 16, 2011 through her date last insured of December 31, 2016 (20 CFR 404.1571 *et seq*.);

3.  Through the date last insured, the claimant had the following severe impairments: seizure disorder, right shoulder fracture, right eye impaired visual perception, depression and anxiety (20 CFR 404.1520(c));

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526);

5.  Through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)[1] since the claimant could engage in lifting

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it

and/or carrying 20 pounds occasionally and 10 pounds frequently; sitting for 6-hours, standing for 6-hours and walking for 6-hours; pushing and/or pulling as much as can lift and/or carry; except she can frequently operate foot controls bilaterally; occasional exposure to ordinary visual hazards such as boxes on the floor and doors left ajar; no exposure to unprotected heights or moving mechanical parts, and occasional operation of a motor vehicle; occasional exposure to dust, odors, fumes and pulmonary irritants; occasionally exposure to extreme cold or heat; limited to perform simple, routine and repetitive tasks; limited to simple work-related decisions; and occasionally interaction with supervisors, co-workers or the general public;

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565 and 416.965);

7. The claimant was born on September 3, 1965 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged onset date of October 16, 2011. The claimant subsequently changed age category to closely approaching advanced age and was age 51 as of the date last insured of December 31, 2016 (20 CFR 404.1563);

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564);

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2);

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569and 404.1569(a));

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from October 16, 2011, the alleged onset date, through December 31, 2016, the date last insured (20 CFR 404.1520(g)).

Tr. 189-216.

---

requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

Accordingly, the ALJ determined that, for a period of disability and disability insurance benefits filed on December 28, 2015, Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 32.

<u>**ANALYSIS**</u>

Plaintiff asserts four points of error. First, Plaintiff alleges that the ALJ failed to properly identify and consider all of Plaintiff's medically determinable conditions—specifically, her headaches and insomnia—at step two of the sequential process and therefore, failed to meaningfully consider these impairments throughout the remainder of the sequential process and failed to incorporate appropriate limitations into his RFC determination. *See* ECF No. 12-1 at 12-15. Next, Plaintiff asserts that the ALJ's RFC determination failed to properly account for Plaintiff's moderate limitations in concentration, persistence, and pace. *See id*. at 15-17. Plaintiff's third and fourth points challenge the ALJ's evaluation of the medical opinion evidence. *See id*. at 17-22. Specifically, Plaintiff argues that the ALJ inappropriately "cherry-picked" the opinion of consultative examiner David Schaich, Psy.D. ("Dr. Schaich"), and improperly weighed the opinion of consultative examiner Renee Baskin, Ph.D. ("Dr. Baskin"). *See id*. Accordingly, Plaintiff argues, the resulting RFC was not based on substantial evidence. *See id*.

The Commissioner argues in response that: (1) substantial evidence supports the ALJ's evaluation of Plaintiff's impairments, including her headaches and insomnia, and Plaintiff failed to identify any objective evidence establishing that additional limitations were warranted; (2)  the ALJ properly accounted for Plaintiff's moderate limitations in concentration, persistence and pace in the RFC finding; and (3) substantial evidence supports the ALJ's evaluation of the medical opinions.  *See* ECF No. 16-1 at 13-29.

A Commissioner's determination that a claimant is not disabled will be set aside when the

factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v.*

*Chater*, 221 F.3d 126, 131 (2d Cir.2000). Substantial evidence has been interpreted to mean "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The

Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168

F.3d at 77.

In its remand order, the Appeals Council directed the ALJ to complete the following:

1) as warranted, obtain additional evidence of the claimant's impairments in order
   to complete the administrative record including obtaining consultative
   examinations and other evidence;

2) further evaluate the claimant's mental impairments in accordance with the
   special technique described in 20 CFR 404.1520a while documenting in the
   decision and providing specific findings and appropriate rationale for each
   functional area described in 20 CFR 404. 1520a(C);

3) give further consideration to the claimant's maximum residual functional
   capacity during the period in issue and provide rationale with specific
   references to the evidence of record in support of the same (SSR 96-8p) and
   explain such weight in accordance with 20 CFR 404.1527; and

4) if warranted by the expanded record obtain evidence from a vocational expert
   to clarify the effects of the assessed limitations on the claimant's occupational
   base while obtaining examples of jobs and incidences of such jobs in the
   national economy, and resolve any conflict with the DOT and its companion
   publication, the Selected Characteristics of Occupations, if applicable in
   accordance with SSR 00-4p.

Tr. 334-35.

As noted above, Plaintiff alleges a disability onset date of October 16, 2011. Tr. 297.

Plaintiff was admitted to Erie County Medical Center ("ECMC") from October 20, 2011, through

October 25, 2011. Tr. 560. She had been referred by DART MMTP (Methadone Maintenance

Treatment Program). *Id*. Plaintiff reported she had been drinking six 40-ounce beers "daily or

more" and taking a couple of "hits" of cannabis per week. *Id*. She also reported "sporatic [sic] use" of Klopopin to decrease alcohol consumption. *Id*.

From December 27, 2011, to December 30, 2011, Plaintiff was admitted to the Emergency Department ("ED") at ECMC due to a "1-minute long tonic-clonic type seizure." Tr. 564. She had a second seizure also lasting about one minute that was "witnessed by the [ED] staff." *Id*. Plaintiff was followed by neurology during her hospitalization and was started on prophylactic Dilantin. Tr. 565. A head CT was unremarkable, and a head CTA (computed tomography angiography) showed normal right and left carotids without evidence of plaque or stenosis and with good flow. *Id*. However, a "2.5 x 2.5 mm aneurysm originating at the superior margin of the distal right internal carotid" was noted." *Id*. A subsequent brain MRI showed no evidence of an infarction; however, there was evidence of early or atypical chronic microvascular ischemic disease and a venous anomaly. *Id*. Plaintiff was advised to follow-up with the neurosurgery clinic to discuss further options. *Id*.

From December 30, 2011, through January 27, 2012, Plaintiff was admitted for inpatient substance abuse treatment. Tr. 537. She reported she had been clean for 15 years but relapsed after her mother died. Tr. 541. She made good progress during her stay and appeared very focused on remaining clean and sober. Tr. 538. She was referred to Lakeshore Behavioral Health ("Lake Shore") for outpatient mental health and substance abuse treatment. Tr. 538.

On February 6, 2012, Plaintiff was seen by Gregory Bennett, M.D. ("Dr. Bennett"), at ECMC's neurosurgical clinic. Tr. 577. Treatment options were discussed, and Plaintiff decided to have surgery to treat the aneurysm. *Id*. The surgery was scheduled for February 16, 2012. *Id*. Plaintiff's initial surgery was successful, however, she developed cerebral edema and intracerebellar hematoma requiring evacuation. Tr. 580. She was extubated postoperatively, but

then she deteriorated neurologically, was reintubated and had a ventriculostomy placed. *Id*. The first ventriculostomy did not function properly, and a second was placed. *Id*. She later required another operation for evacuation of clots and placement of a subdural drain. *Id*. Thereafter, Plaintiff's condition improved, she was extubated, and the drain was removed. *Id*. On February 28, 2012, Plaintiff was discharged from the hospital and transferred to the rehabilitation program at ECMC. Tr. 580, 583. Functional deficits were noted upon discharge, including: "cranial nerve palsy of cranial nerve III and possibly cranial nerve II on the right;" and dilated right pupil with inconsistent perception of light and finger movement, for which an ophthalmology consultation was recommended. Tr. 581., Plaintiff was discharged home on March 7, 2012. *Id*.

On March 23, 2012, Plaintiff underwent a head CT scan due to complaint of headaches. Tr. 588, 590. The CT scan revealed status post removal of shunt catheter and status post removal of right subdural drain with persistent right frontal craniotomy. Tr. 588, 590. The report also noted "interval development of hydrocephalus." *Id*. Plaintiff continued to complain of headaches, and another head CT scan was performed in April 2012. Tr. 598. This CT scan revealed no evidence of hemodynamically significant stenosis, unchanged previous internal carotid artery aneurysm clip, and stable right frontal lobe encephalomalacia in right frontal craniotomy. *Id*.

Plaintiff followed-up with Dr. Bennett on May 3, 2012. Tr. 604. She reported migraine pain and was advised to return on May 7, 2012. *Id*. When she returned on May 7, 2012, she reported ongoing headaches, stating she had three to four per week. Tr. 605. On May 14, 2012, Dr. Bennett refilled her Ambien prescription. Tr. 606. At a follow-up appointment on May 21, 2012, Plaintiff reported increased headaches. Tr. 607. During a visit with Dr. Bennett on June 4, 2012, Plaintiff reported she had a migraine headache. Tr. 608. Her vision in her right eye improved slightly—she

could do some facial recognition, but still could not read with that eye. *Id*. She was started on Topamax for her migraines. *Id*.

On June 29, 2012, Plaintiff went to the ED at ECMC, complaining of headaches and chest pain. Tr. 609. She had no neurological deficits. Tr. 609. Plaintiff was noted to be "on Topamax for migraine prophylaxis." Tr. 609. While at the hospital, Plaintiff's "headache [was] resolved and did not recur." Tr. 609. Her EKG was normal, and her chest pains were deemed to be atypical. Tr. 609.

On July 4, 2012, Plaintiff was seen in the ED at Buffalo General Medical Center ("BGMC"), complaining of anxiety, chest pain, and headache. Tr. 1024, 1028. Plaintiff stated she went to BGMC instead of ECMC (where she had been hospitalized a few days prior) because she confused the letters. Tr. 1027. She also reported she was confused about instructions after her ECMC ED visit because she attempted to follow-up on cardiac treatment issues with a neurologist. *Id*. The BGMC ED physician noted that Plaintiff was occasionally confused but was "redirectable." *Id*. She was advised to follow-up with her primary care physician. *Id*.

Plaintiff went back to ECMC ED in September 2012 complaining of forgetfulness and visual hallucinations. Tr. 612. She reported she had been having more headaches and had been experiencing hallucinations and forgetfulness since the February 2012 surgery. Tr. 612. Her neurological exam was normal. Tr. 614. The ED physician opined that Plaintiff's hallucinations, forgetfulness, and headaches were "likely due to substance abuse" and less likely due to seizures. Tr. 614.

On October 18, 2012, Dr. Bennett performed a cranioplasty. Tr. 626. During a post-operative appointment with Dr. Bennett in November 2012, Plaintiff requested a prescription for Ambien. Tr. 657. Plaintiff was instructed to follow-up in three years. *Id*.

On January 8, 2013, Plaintiff began treatment at Lake Shore for substance abuse and anxiety. Tr. 675. She was alert and neat and exhibited good eye contact. *Id*. She showed a cooperative attitude and was honest. Tr. 676. She admitted to relapsing two days earlier. *Id*. Plaintiff's mood was euthymic, and her affect was full ranging and normal. *Id*. She exhibited a normal speech pattern and logical and rational thought process; her ability to concentrate and pay attention were normal; her memory was fair; and abstraction was normal. Tr. 677-78.

Three days later, on January 11, 2013, Plaintiff underwent a consultative psychological examination with Dr. Baskin. Tr. 680-84. Upon mental status examination, Plaintiff was responsive and cooperative and maintained good eye contact. Tr. 682. Her thought processes were coherent and goal-directed, but "at times [she] appeared somewhat confused and overwhelmed." Tr. 682. Her affect was somewhat tense and anxious, but her mood was euthymic. Tr. 682. Dr. Baskin noted that although Plaintiff "was somewhat nervous and a little confused, she was nevertheless polite and easily engaged." Tr. 682. Her attention and concentration were mildly impaired "due to current psychiatric disorder/substance abuse." *Id*. Her recent and remote memory skills were noted to be "mildly impaired for the same reasons." Tr. 683. Her insight was limited, and her judgment was poor. *Id*.

Plaintiff stated she was able to do activities of daily living "with [her] son or with other adult." Tr. 683. She said she needed to be accompanied for all things, "including showering with [her] son in [her] bedroom." *Id*. She stated she could manage her own money, and she primarily spent her time at home watching television and reading. *Id*. Dr. Baskin opined that Plaintiff would have moderate limitations in following and understanding simple directions and performing simple tasks independently. *Id*. She would have marked limitations in being able to maintain attention and

concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress. *Id*.

Plaintiff also underwent a consultative neurologic examination with Hongbaio Liu, M.D. ("Dr. Liu") on January 11, 2013. Tr. 691-94. Plaintiff reported she could cook three times a week, clean the house twice a week, and do laundry once or twice a week. Tr. 692. She also reported she could take a shower, bathe, and dress by herself every day. *Id*. Upon examination, Plaintiff exhibited normal gait; she could walk on her heels and toes without difficulty; and she could tandem-walk and heel-to-toe walk normally. *Id*. She maintained appropriate eye contact; she exhibited no indication of memory, insight, or judgment impairment; and her mood and affect were appropriate. *Id*. Her hand and finger dexterity were intact; her grip strength was 5/5 bilaterally; and her strength and sensation were intact. Tr. 693. Dr. Liu opined that Plaintiff had mild limitation for routine activities and advised that she avoid heavy machinery operation because of history of seizures and moderate exertional activities because of her cardiac condition. *Id*.

On January 16, 2013, Dr. Cheryl Butensky, a state agency psychological consultant, reviewed the record evidence and opined that Plaintiff had mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and pace. Tr. 304. She further opined that Plaintiff retained the capacity to perform simple job tasks and had mild to moderate limitations in her ability to sustain attention and concentration, adapt to changes in a routine work setting, and interact appropriately with coworkers and supervisors. *Id*.

On July 18, 2015, Plaintiff went to the ECMC ED "after an episode of apparent seizure activity." Tr. 709. However, she had "regained her baseline mental status" by the time she arrived in the ED. *Id*. It was noted that Plaintiff was taking Methadone for past substance abuse. *Id*. She

complained of a diffuse, throbbing headache and nausea, but denied dizziness, confusion or vision changes. *Id*. After an episode of sinus bradycardia, Plaintiff was admitted for observation. Tr. 710. On physical examination, Plaintiff exhibited appropriate appearance, no memory impairment, normal thought pattern, and no apparent hallucinations. Tr. 723. A head CT scan was stable when compared to the March 2013 CT scan, with no acute intracranial findings. Tr. 725, 747.

On August 19, 2015, Plaintiff initiated primary care treatment with Jewell Henley, M.D. ("Dr. Henley"). Tr. 829-32. Plaintiff complained of depression and long-time insomnia. Tr. 830. She reported she was a recovering alcoholic and was in a methadone treatment program. Tr. 831. She stated that she had not had a drink since June 2014, but is still using marijuana. *Id*. Her physical exam was normal, including normal mood, normal affect, normal gait, and full range of motion in all extremities. *Id*.

On May 4, 2016, Plaintiff returned to Dr. Henley to follow up on her headaches. Tr. 834-36. Plaintiff stated that her children thought she had a seizure, because she was "acting funny" and not responding when spoken to, but Plaintiff denied having had a seizure. Tr. 834. She said she needed to have her anti-seizure medicine refilled. *Id*. She also had not been taking her blood pressure medication. *Id*. Her physical exam was normal. Tr. 835. When Plaintiff returned to see Dr. Henley on June 10, 2016, she reported she was not taking her seizure medication because she believed her seizures were alcohol related and she had not been drinking. Tr. 837. Plaintiff reported she needed "something to sleep," but Ambien was too strong. She stated she did not get melatonin, which Dr. Henley had previously recommended for insomnia (Tr. 832, 837); however, Motrin PM and trazodone had worked for her (Tr. 837). Plaintiff's physical exam was normal. Tr. 838.

Plaintiff followed up with Dr. Bennett on July 18, 2016. Tr. 784. Plaintiff reported "she feels fine and was not having any headaches or seizures." Tr. 784. She was neurologically intact, with the exception of impaired vision in the right eye. *Id*.

Plaintiff followed up with Dr. Bennett about a month later, complaining of frontal head pain, rated 3 out of 10. Tr. 782. Plaintiff reported she continued to smoke, and smoking cessation was encouraged. *Id*. She had slight tenderness over the previous craniotomy site, but she was neurologically intact. *Id*. She followed up with Dr. Bennett on December 5, 2016. Tr. 780. She reported having a nocturnal seizure about a week earlier. *Id*. She reported she had not been taking her seizure medication because she never picked up her prescriptions from the pharmacy. *Id*. She also reported she had "recently quit alcohol about 90 days ago," and she said she didn't smoke. *Id*. Her vision in the right eye was "decreased to sensing shells and movement." Tr. 780.

On November 29, 2017, Plaintiff underwent a neurologic consultative examination with Samuel Balderman, M.D. ("Dr. Balderman"). Tr. 759-61. Plaintiff said her main medical problem was seizures. Tr. 759. She reported having seizures monthly, but she had not been taking any seizure medication for six months "due to lack of funding." *Id*. Upon examination, her gait was normal, she could walk on her heels and toes without difficulty, and tandem walk heel-to-toe was normal. Tr. 760. Plaintiff had poor eye contact, but she was oriented to time, person, and place. *Id*. Her mood and affect were distant, but she displayed no indication of memory, judgment, or insight impairment. *Id*. Her hand and finger dexterity were intact, and her grip strength was 5/5 bilaterally. *Id*. Finger-to-nose testing was normal; her upper and lower extremities exhibited 5/5 strength; she had no tremors; and her sensation was intact. Tr. 761. Dr. Balderman said she should not work at unprotected heights or operate heavy machinery. *Id*.

Dr. Balderman also completed a medical source statement assessing Plaintiff's ability to do work-related activities. Tr. 790-95. He opined that she could lift and/or carry up to 20 pounds continuously. Tr. 790. She could sit, stand, and walk 2 hours each at a time. Tr. 791. She could sit 5 hours total, stand 4 hours total, walk 4 hours total, and did not require a cane for ambulation. *Id*. She could reach frequently and operate foot controls frequently (Tr. 792), and she could frequently climb ramps and stairs, balance, stoop, and kneel, occasionally crouch, and never crawl or climb ladders or scaffolds (Tr. 793). She could never work around unprotected heights or moving mechanical parts and she could never operate a motor vehicle, and she could tolerate occasional exposure to humidity, wetness, pulmonary irritants, extreme heat and cold, and vibrations, she could tolerate loud noise. Tr. 794.

Plaintiff also saw Dr. Schaich for a psychiatric consultative exam on November 29, 2017. Tr. 763-69. Plaintiff said she drank occasionally and used marijuana every day. Tr. 764. She also went for Methadone every day. *Id*. She was cooperative and her manner of relating was adequate. Tr. 764. Her posture was tense, and her motor behavior was somewhat lethargic. *Id*. She exhibited coherent and goal-directed thought process, restricted affect, irritable mood, mildly impaired attention and concentration due to cognitive deficits and possible psychosis, and mildly impaired memory for the same reasons. Tr. 765. Her insight and judgment were poor. *Id*.

Plaintiff said she could dress, bathe, and groom herself, and clean and do laundry, but she did not cook or prepare food. Tr. 765. She could take public transportation on her own. Tr. 766. Her family relationships were fair. *Id*. Dr. Schaich opined that Plaintiff had no limitation in her ability to remember or apply simple directions and instructions or remember or apply complex directions and instructions. Tr. 766. She was moderately limited in her ability to use reason and judgment to make work-related decisions, interact adequately with supervisors, coworkers, and

15

the public, sustain concentration and perform a task at a consistent pace, sustain an ordinary routine and regular attendance at work, regulation emotions, control behavior, and maintain well-being. *Id*. She had no limitation in her ability to maintain personal hygiene and appropriate attire. *Id*. She was mildly limited in her ability to be aware of normal hazards and take appropriate precautions. *Id*. He opined that her difficulties were caused by depression with psychosis, substance abuse, and cognitive deficits. *Id*.

Upon careful review of the record in this case, the Court finds that the ALJ fully complied with the above-noted directions in the Appeals Council's order and set forth a well-supported RFC finding. The ALJ granted appropriate weight to the opined limitations that were supported by the record, and the RFC assessed by the ALJ was supported by substantial evidence.

A claimant's RFC is the most she can still do despite her limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. Oct. 15, 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. Dec. 1, 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.). Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In so doing, the ALJ may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Moreover, an ALJ is free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d at 588.

In her first point of error, Plaintiff argues that the ALJ failed to consider headaches or insomnia at step two of the sequential process and did specifically identify whether they were severe, non-severe, or medically nondeterminable. *See* ECF No. 12-1 at 12-15. Plaintiff's argument is unavailing. The ALJ is not required to discuss every individual piece of information submitted as evidence. *See, e.g.*, *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 78-79 (N.D.N.Y. 2005) ("The ALJ was not required to mention or discuss every single piece of evidence in the record." (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983))). Rather, where "the evidence of record permits [the court] to glean the rationale of an ALJ's decision, [the ALJ is not required to explain]

why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Mongeur*, 722 F.2d at 1040; *Spaich v. Berryhill*, No. 1:15-CV-00274-MAT, 2017 WL 6014451, at *5 (W.D.N.Y. Dec. 5, 2017).

Notably, most of Plaintiff's complaints of headaches occurred during the period immediately following her February 2012 brain surgery.  Tr. 588, 590, 598, 604, 605, 607. 608, 609, 612, 1028. After a CT scan in April 2012 (Tr. 598), Plaintiff continued to complain of headaches during follow-up visits with Dr. Bennett in May 2012 and June 2012. Tr. 604, 605, 607, 608. In June 2012, July 2012, and September 2012, Plaintiff went to the ED complaining of headaches. Tr. 609, 612, 1024. After that, she only went to the ED for what appeared to be a post-seizure headache in July 2015; the only other times she mentioned headaches was in the context of reporting her medical history. Tr. 691, 709, 834. By July 2016, Plaintiff said she was not having headaches. Tr. 784.

Although the ALJ did not specifically find Plaintiff's headaches to be a severe impairment, he acknowledged Plaintiff complaints of headaches and implicitly considered the limiting effects of the headaches by relying, in part, on the January 2013 opinion of Dr. Liu, who specifically considered Plaintiff's headaches, and whose opinion the ALJ assigned partial weight.. Tr. 157, 160-61, 166. Plaintiff told Dr. Liu she began experiencing daily headaches after her 2012 brain surgery and that light and noise worsened the pain. Tr. 691. The only limitation Dr. Liu recommended was no exposure to heavy machinery (Tr. 693), which was included in the ALJ's RFC finding, along with additional limitations the ALJ ultimately determined were warranted (Tr. 160). The ALJ also considered the objective findings from Plaintiff's July 2015 ED visit during which she reported headaches—one of the only visits after 2012 where Plaintiff complained of headaches. Tr. 157, 164, 709. While the ALJ did not specifically discuss Plaintiff's complaints of

headache at this visit, he did consider the objective findings from the visit and the findings and recommendations of the examining physician. Tr. 164.

The record similarly contains little evidence of Plaintiff's insomnia, and again, mostly in the time period following her February 2012 brain surgery. In May 2012, Dr. Bennett refilled Plaintiff's prescription for Ambien to treat her insomnia. Tr. 606. In November 2012, shortly after her cranioplasty, Plaintiff requested a prescription for Ambien. Tr. 657. In August 2015, Plaintiff told Dr. Henley she had "long-time insomnia [and] was on trazodone in the past." Tr. 830. Dr. Henley recommended melatonin, but Plaintiff did not take it. Tr. 832, 837. At the next visit with Dr. Henley in May 2016, Plaintiff said Ambien was too strong, but Motrin PM and trazodone had helped her insomnia. Tr. 837. Neither the notes from the August 2015 visit, nor the follow-up visits, identified limitations resulting from Plaintiff's complaint of insomnia. An impairment is not severe if it does not significantly limit a claimant's ability to perform basic work activities for at least 12 months. *See Barnhart v. Walton*, 533 U.S. 212, 217-22 (2002).

Based on the foregoing, substantial evidence supports the ALJ's evaluation of Plaintiff's impairments, including her complaints of headaches and insomnia. Plaintiff has failed to identify, based on objective evidence, that additional limitations were warranted because of these impairments. Thus, she has failed to meet her burden of proving she could not perform the RFC as formulated by the ALJ.

Contrary to Plaintiff's next point, the ALJ properly accounted for Plaintiff's moderate limitations in concentration, persistence, and pace by limiting her to simple, routine, and repetitive tasks and simple work-related decisions. *See* ECF No. 12-1 at 15. An RFC for unskilled work is fully consistent with moderate limitations in concentration persistence and pace. *See Coleman v. Comm'r of Soc. Sec.*, 335 F.Supp.3d 389, 401 (W.D.N.Y. 2018) (citing *Tatelman v. Colvin*, 296

F.Supp.3d 608, 613 (W.D.N.Y. 2017) ("it is well-settled that a limitation to unskilled work . . . sufficiently accounts for limitations relating to stress and production pace.")). Furthermore simple, routine tasks can account for moderate limitations in concentration, persistence, or pace if the medical evidence demonstrates the claimant can perform simple, routine tasks or unskilled work despite the moderate limitations. *See McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014) (citing *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)).

In this case, the medical evidence shows that Plaintiff retained the ability to perform simple, routine, and repetitive tasks, or unskilled work, despite her moderate limitations in concentration, persistence, or pace. As the ALJ noted, Dr. Schaich opined that Plaintiff had moderate limitations in her ability to maintain concentration and perform a task at a consistent pace, but had no limitation in her ability to understand, remember, and carry out simple instructions. Tr. 166-67, 766, 768. Dr. Schaich based his opinion on his examination of Plaintiff, which revealed mildly impaired attention, concentration, and memory and intact thought process. Tr. 765. As the ALJ noted, Dr. Schaich's opinion was also consistent with Plaintiff's reported daily activities, which included taking public transportation, doing laundry, watching television, and cleaning. Tr. 167, 692. 765. The opinion is also consistent with objective findings from other sources, which reveal euthymic mood, full ranging affect, normal speech pattern, logical and rational thought process, normal attention and concentration, fair memory, and normal abstraction. Tr. 678, 692, 760.

Based on the foregoing, substantial evidence supports the ALJ's finding that Plaintiff could perform simple, routine, and repetitive work despite her moderate limitations in concentration, persistence, and pace.

Plaintiff's final two points challenge the ALJ's weighing of the medical opinion evidence, specifically the opinions of consultative examiners Dr. Schaich and Dr. Baskin. *See* ECF No. 12-1 at 17-22. First, with respect to Dr. Schaich, the Court finds that the ALJ properly evaluated the opinion and did not "cherry-pick" the opinion, as Plaintiff argues. *See id*. The ALJ explained his reasons for giving more weight to the specific function-by-function limitations in Dr. Schaich's medical source statement than to the limitations in the narrative paragraph at the end of his consultative exam notes. Tr. 167, 766, 768-69. The ALJ explained he was giving the limitations regarding specific work-related activities more weight because they provided clarity and definition. Tr. 167. The ALJ did not suggest that Dr. Schaich's narrative limitations were based on Plaintiff's subjective complaints, as Plaintiff argues. *See* ECF No. 12-1 at 19. As noted above, the ALJ explained his reasons for giving less weight to the narrative portion of statement. Tr. 167. Furthermore, there was no need to recontact Dr. Schaich, as Plaintiff argues (*see* ECF No. 12-1 at 21) because Dr. Schaich already clarified his opinion in his medical source statement regarding Plaintiff's abilities to perform work-related activities. Tr. 768-69.

Plaintiff's argument that the ALJ cherry-picked Dr. Schaich's opinion (*see* ECF No. 12-1 at 17-19) likewise fails. The ALJ's RFC finding is wholly consistent with the limitations Dr. Schaich opined in his medical source statement, as noted above. Tr. 160, 768-69. Dr. Schaich opined that Plaintiff had moderate limitations in the ability to make judgments on complex work-related decisions, and the ALJ limited Plaintiff to simple work-related decisions. Tr. 160, 768. To account for Dr. Schaich's opinion that Plaintiff was moderately limited in her ability to interact with the public, supervisors, and co-workers, the ALJ limited her to occasional interaction with these groups. Tr. 160, 769. The ALJ also limited Plaintiff to routine and repetitive tasks to account for Dr. Schaich's opinion that Plaintiff was moderately limited in responding appropriately to usual

work situations and changes in a routine work setting. Tr. 160, 769. Accordingly, the Court finds no error in the ALJ's evaluation of Dr. Schaich's opinion.

The ALJ also properly evaluated Dr. Baskin' opinion. Dr. Baskin opined that Plaintiff had marked limitations in being able to maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress. Tr. 683. As the ALJ explained, this opinion was entitled to little weight because it was inconsistent with the medical record and Dr. Baskin's own objective findings. Tr. 166. For instance, Dr. Baskin observed that Plaintiff's attention, concentration, and memory were only mildly impaired. Tr. 682-83. She also observed coherent and goal-directed thought process overall and euthymic mood. Tr. 682. Plaintiff was nervous, but she was also polite and easily engaged. Tr. 682. Consistency is a factor in deciding the weight accorded to any medical opinion. *Michels v. Astrue*, 297 F. App'x 74, 76 (2d Cir. 2008); *see also Monroe v. Colvin*, 676 F. App'x 5, 7-8 (2d Cir. 2017) (holding an ALJ had properly discounted a medical source opinion based on, among other things, the inconsistency of that physician's opinion with his treatment notes). Thus, the ALJ reasonably discounted Dr. Baskin's opinion based on its internal inconsistency and its inconsistency with the record as a whole.

As noted above, it was Plaintiff's burden to produce evidence proving her RFC and disability, which she has failed to do. *See Burgess v. Astrue*, 537 F.3d at 128. Because Plaintiff has presented no medical evidence of functional limitations greater than those found by the ALJ, she has failed to meet her burden to demonstrate that she had a more restrictive RFC than found by the ALJ. *See Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (unpublished summary order) (Plaintiff "had a duty to prove a more restrictive RFC, and failed to do so"); *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

While Plaintiff may disagree with the ALJ's conclusion, the Court must "defer to the Commissioner's resolution of conflicting evidence" and reject the ALJ's findings "only if a reasonable factfinder would have to conclude otherwise." *Morris v. Berryhill*, No. 16-02672, 2018 WL 459678, at *3 (2d Cir. Jan. 18, 2018) (internal citations and quotations omitted). That is not the case here. The ALJ appropriately assessed the medical evidence and Plaintiff's testimony regarding his function abilities to formulate Plaintiff's RFC.

For all these reasons, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole. Therefore, the Court finds no error.

## <u>CONCLUSION</u>

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 12) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 16) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE